Sheehan & Associates, P.C.
Spencer Sheehan
505 Northern Blvd Ste 311
Great Neck NY 11021-5101
Telephone: (516) 303-0552
Fax: (516) 234-7800
*spencer@spencersheehan.com*

Reese LLP
Michael R. Reese
100 W 93rd St Fl 16
New York NY 10025-7524
Telephone: (212) 643-0500
Fax: (212) 253-4272
*mreese@reesellp.com*

United States District Court
Eastern District of New York                                    1:20-cv-01347

| | |
|---|---|
| Sonya Lamonakis, individually and on behalf of all others similarly situated, | |
| Plaintiff, | |
| - against - | Complaint |
| Blue Diamond Growers, | |
| Defendant | |

Plaintiff by attorneys allege upon information and belief, except for allegations pertaining to plaintiff, which are based on personal knowledge:

1.      Blue Diamond Growers ("defendant") manufactures, distributes, markets, labels and sells almondmilk and coconutmilk blend flavored primarily from vanilla beans instead of non-vanilla vanillin under the Almond Breeze brand ("Products").

2.      The Products are available to consumers from retail and online stores of third-parties and are sold in sizes including cartons of 32 OZ and 64 OZ.

3.      The front label representations include the brand, "Almond Breeze," "almondmilk

coconutmilk blend," "Unsweetened," "Vanilla" "with other natural flavors," "Non-GMO Verified," and pictures of almonds and coconuts.



4.     The unqualified, prominent and conspicuous representations as "Vanilla" is false, deceptive and misleading because the Product contains non-vanilla flavors which imitate and extend vanilla but are not derived from the vanilla bean, yet these flavors are not disclosed to consumers as required and expected.

I.   Increase in Consumption of Non-Dairy, Plant-Based Milk Alternatives

5.     Over the past ten years, the number of dairy milk substitutes has proliferated to include "milks" (milk-like beverages) made from various agricultural commodities.

6.     Reasons for consuming non-dairy milks include avoidance of animal products due to health, environmental or ethical reasons, dietary goals or food allergies.[1]

---

[1] Margaret J. Schuster, et al. "Comparison of the Nutrient Content of Cow's Milk and Nondairy Milk Alternatives: What's the Difference?," *Nutrition Today* 53.4 (2018): 153-159.

7.     Some of the most popular milk alternatives are made from tree nuts (almonds and coconuts) grains (rice) and legumes (soybeans).

8.     These milk substitutes "exhibit different sensory characteristics, stability and nutritional composition from cow's milk" and amongst each other.[2]

9.     Food intolerance is one of the main reasons consumers turn to alternative milk products, given that 4.3 percent of adults are said to experience discomfort when consuming milk.[3]

10.    Of the 7.2 million U.S. adults with food allergies (distinct from intolerance), 3 million are allergic to tree nuts, 1.5 million are allergic to soy and under 1 million allergic to rice.[4]

11.    Because allergies are typically common to a specific food type, consumers have preferences for one over the other and seldom switch between their "plant milk" of choice.

12.    Blending of milks derived from tree nuts is common because it is unlikely that a consumer will be allergic to almonds but not to coconuts and vice versa.

13.    A milk alternative made from almonds and coconut will combine the "nutty" taste of almonds with the "naturally sweet [and] thicker" texture provided by coconut milk.[5]

14.    The sweeter and creamier coconut milk, when combined with almond milk, will affect the need to provide sweetening and flavoring ingredients, and those provided will be unique in type, amount and strength than if almond milk had been prepared separately.

II.    Vanilla is Constantly Subject to Efforts at Imitation Due to High Demand

15.    The tropical orchid of the genus Vanilla (*V. planifolia*) is the source of the prized

---

[2] Aline Silva et al., "Health Issues and Technological Aspects of Plant-based Alternative Milk," Food Research International, May 2020.

[3] Kirsi M. Jarvinen-Seppo et al., "Milk allergy: Clinical features and diagnosis." Up ToDate, Waltham, MA (2013).

[4] Ruchi Gupta et al., "Prevalence and severity of food allergies among US adults," JAMA network open 2, no. 1 (2019): e185630-e185630.

[5] Jamie Lincoln, "Ditching Dairy? Here's a Cheat Sheet to the Tastiest Milk Alternatives," Vogue.com, August 18, 2016.

flavor commonly known as vanilla, defined by law as "the total sapid and odorous principles extractable from one-unit weight of vanilla beans."[6]

16.   Vanilla's "desirable flavor attributes…make it one of the most common ingredients used in the global marketplace, whether as a primary flavor, as a component of another flavor, or for its desirable aroma qualities."[7]

17.   Though the Pure Food and Drugs Act of 1906 ("Pure Food Act") was enacted to "protect consumer health and prevent commercial fraud," this was but one episode in the perpetual struggle against those who have sought profit through sale of imitation and lower quality commodities, dressed up as the genuine articles.[8]

18.   It was evident that protecting consumers from fraudulent vanilla would be challenging, as E. M. Chace, Assistant Chief of the Foods Division of the U.S. Department of Agriculture's Bureau of Chemistry, noted "There is at least three times as much vanilla consumed [in the United States] as all other flavors together."[9]

19.   This demand could not be met by natural sources of vanilla, leading manufacturers to devise clever, deceptive and dangerous methods to imitate vanilla's flavor and appearance.

20.   Today, headlines tell a story of a resurgent global threat of "food fraud" – from olive oil made from cottonseeds to the horsemeat scandal in the European Union.[10]

---

[6] 21 C.F.R. §169.3(c).

[7] Daphna Havkin-Frenkel, F.C. Bellanger, Eds., Handbook of Vanilla Science and Technology, Wiley, 2018.

[8] Berenstein, 412; some of the earliest recorded examples of food fraud include unscrupulous Roman merchants who sweetened wine with lead.

[9] E. M. Chace, "The Manufacture of Flavoring Extracts," Yearbook of the United States Department of Agriculture 1908 (Washington, DC: Government Printing Office, 1909) pp.333–42, 333 quoted in Nadia Berenstein, "Making a global sensation: Vanilla flavor, synthetic chemistry, and the meanings of purity," History of Science 54.4 (2016): 399-424 at 399.

[10] Jenny Eagle, 'Today's complex, fragmented, global food supply chains have led to an increase in food fraud', FoodNavigator.com, Feb. 20, 2019; M. Dourado et al., Do we really know what's in our plate?. Annals of Medicine, 51(sup1), 179-179 (May 2019); Aline Wisniewski et al., "How to tackle food fraud in official food control authorities in Germany." Journal of Consumer Protection and Food Safety: 1-10. June 11, 2019.

21.  Though "food fraud" has no agreed-upon definition, its typologies encompass an ever-expanding, often overlapping range of techniques with one common goal: giving consumers less than what they bargained for.

A.  Food Fraud as Applied to Vanilla

22.  Vanilla is considered a "high-risk [for food fraud] product because of the multiple market impact factors such as natural disasters in the source regions, unstable production, wide variability of quality and value of vanilla flavorings," second only to saffron in price.[11]

23.  The efforts at imitating vanilla offers a lens to the types of food fraud regularly employed across the spectrum of valuable commodities in today's interconnected world.[12]

| Type of Food Fraud | Application to Vanilla |
| --- | --- |
| ➢ Addition of markers specifically tested for instead of natural component of vanilla beans | • Manipulation of the carbon isotope ratios to produce synthetic vanillin with similar carbon isotope composition to natural vanilla |
| ➢ Appearance of *more* and/or higher quality of the valued ingredient | • Ground vanilla beans and/or seeds to provide visual appeal as "specks" so consumer thinks the product contains real vanilla beans, when the ground beans have been exhausted of flavor<br>• Caramel to darken the color of an imitation vanilla so it more closely resembles the hue of real vanilla[13]<br>• Annatto and turmeric extracts in dairy products purporting |

---

[11] Société Générale de Surveillance SA, ("SGS "), Authenticity Testing of Vanilla Flavors – Alignment Between Source Material, Claims and Regulation, May 2019.

[12] Kathleen Wybourn, DNV GL, Understanding Food Fraud and Mitigation Strategies, PowerPoint Presentation, Mar. 16, 2016.

[13] Renée Johnson, "Food fraud and economically motivated adulteration of food and food ingredients." Congressional Research Service R43358, January 10, 2014.

|  |  |
|---|---|
|  | to be flavored with vanilla, which causes the color to better resemble the hue of rich, yellow butter |
| ➢ Substitution and replacement of a high-quality ingredient with alternate ingredient of lower quality | • Tonka beans, though similar in appearance to vanilla beans, are banned from entry to the United States due to fraudulent use<br>• Coumarin, a toxic phytochemical found in Tonka beans, added to imitation vanillas to increase vanilla flavor perception |
| ➢ Addition of less expensive substitute ingredient to mimic flavor of more valuable component | • Synthetically produced ethyl vanillin, from recycled paper, tree bark or coal tar, to imitate taste of real vanilla |
| ➢ Compounding, Diluting, Extending | • "to mix flavor materials together at a special ratio in which they [sic] compliment each other to give the desirable aroma and taste"[14]<br>• Combination with flavoring substances such as propenyl guaethol ("Vanitrope"), a "flavoring agent [, also] unconnected to vanilla beans or vanillin, but unmistakably producing the sensation of vanilla"[15]<br>• "Spiking" or "fortification" of vanilla through addition of natural and artificial flavors including vanillin, which simulates vanilla taste but obtained from tree bark |
| ➢ Addition of fillers to give the impression there is more of the product than there actually is | • Injection of vanilla beans with mercury, a poisonous substance, to raise the weight of vanilla beans, alleged in *International Flavors and Fragrances (IFF), Inc. v. Day Pitney LLP and Robert G. Rose,* 2005, Docket Number L- |

---

[14] Chee-Teck Tan, "Physical Chemistry in Flavor Products Preparation: An Overview" in Flavor Technology, ACS Symposium Series, Vol. 610 1995. 1-17.
[15] Berenstein, 423.

4486-09, Superior Court of New Jersey, Middlesex County

- Subtle, yet deliberate misidentification and obfuscation of a product's components and qualities as they appear on the ingredient list

  o "ground vanilla beans" gives impression it describes unexhausted vanilla beans when actually it is devoid of flavor and used for aesthetics

  o "natural vanilla flavorings" – "-ing" as suffix referring to something *like* that which is described

➢ Ingredient List Deception[16]　　　　o "Vanilla With Other Natural Flavors" – implying – wrongly – such a product has a sufficient amount of vanilla to characterize the food

  o "Natural Flavors" – containing "natural vanillin" derived not from vanilla beans but from tree pulp. When paired with real vanilla, vanillin is required to be declared as an artificial flavor

  o "Non-Characterizing" flavors which are not identical to vanilla, but that extend vanilla

24.　　The "plasticity of legal reasoning" with respect to food fraud epitomize what H. Mansfield Robinson and Cecil H. Cribb noted in 1895 in the context of Victorian England:

the most striking feature of the latter-day sophisticator of foods is his knowledge of the law and his skill in evading it. If a legal limit on strength or quality be fixed for any substance (as in the case of spirits), he carefully brings his goods right down to it, and perhaps just so little below that no magistrate would convict him.

*The law and chemistry of food and drugs*. London: F.J. Rebman at p. 320.[17]

B.　The Use of Vanillin to Simulate Vanilla

---

[16] Recent example of this would be "evaporated cane juice" as a more healthful sounding term to consumers to identify sugar.
[17] Cited in Sébastien Rioux, "Capitalist food production and the rise of legal adulteration: Regulating food standards in 19th-century Britain," Journal of Agrarian Change 19.1 (2019) at p. 65 (64-81).

III.    Flavor Industry's Efforts to Use Less Vanilla, Regardless of any Shortages

25.    The "flavor industry" refers to the largest "flavor houses" such as Symrise AG, Firmenich, Givaudan, International Flavors and Fragrances (including David Michael), Frutarom and Takasago International along with the largest food manufacturing companies such as Unilever.

26.    The recent global shortage of vanilla beans has provided the flavor industry another opportunity to "innovate[ing] natural vanilla solutions…to protect our existing customers."[18]

27.    Their "customers" do not include the impoverished vanilla farmers nor consumers, who are sold products labeled as "vanilla" for the same or higher prices than when those products contained *only* vanilla.

28.    These efforts include (1) market disruption and manipulation and (2) the development of alternatives to vanilla which completely or partially replace vanilla.

A.    Attempts to Disrupt Supply of Vanilla to Create a "Permanent Shortage"

29.    The flavor industry has developed schemes such as the "Sustainable Vanilla Initiative" and "Rainforest Alliance Certified," to supposedly assure a significant supply of vanilla at stable, reasonable prices paid to the farmers.

30.    However, these programs make vanilla less "sustainable" by paying farmers to destroy their vanilla plants and produce palm oil under the pretense of "crop diversification."

31.    Other tactics include "phantom bidding," where "deep-pocketed" saboteurs claim they will pay a higher price to small producers, only to vanish, leaving the farmers forced to sell at bottom dollar to remaining bidders.[19]

32.    The reasons for these counterintuitive actions is because the flavor industry benefits

---

[18] Amanda Del Buouno, Ingredient Spotlight, Beverage Industry, Oct. 3, 2016.
[19] Monte Reel, The Volatile Economics of Natural Vanilla in Madagascar, Bloomberg.com, Dec. 16, 2019.

from high vanilla prices and the use of less real vanilla.

33.     When less vanilla is available, the customers of the flavor companies – food manufacturers – must purchase the higher margin, proprietary, "vanilla-like" flavorings made with advanced technology and synthetic biology.

B.   Use of Vanilla Compound Ingredients to Replace and Provide Less Vanilla

34.     Though flavor companies will not admit their desire to move off real vanilla, this conclusion is consistent with the comments of industry executives.

35.     According to Suzanne Johnson, vice president or research at a North Carolina laboratory, "Many companies are trying to switch to natural vanilla with other natural flavors [WONF] in order to keep a high-quality taste at a lower price," known as "Vanilla WONF."

36.     The head of "taste solutions" at Irish conglomerate Kerry urged flavor manufacturers to "[G]et creative" and "build a compounded vanilla flavor with other natural flavors."

37.     A compounded vanilla flavor "that matches the taste of pure vanilla natural extracts" can supposedly "provide the same vanilla taste expectation while requiring a smaller quantity of vanilla beans. The result is a greater consistency in pricing, availability and quality."[20]

38.     These compounded flavors exist in a "black box" with "as many as 100 or more flavor ingredients," including potentiators and enhancers, like maltol and piperonal, blended together to enhance the vanilla, allowing the use of less vanilla to achieve the intended taste.[21]

39.     The effort to replace vanilla with so-called Vanilla WONF started in the late 1960s, but the last 10 years have seen the proliferation of this ingredient.

---

[20] Donna Berry, Understanding the limitations of natural flavors, BakingBusiness.com, Jan. 16, 2018.
[21] Hallagan and Drake, FEMA GRAS and U.S. Regulatory Authority: U.S. Flavor and Food Labeling Implications, Perfumer & Flavorist, Oct. 25, 2018; Charles Zapsalis et al., *Food chemistry and nutritional biochemistry*. Wiley, 1985, p. 611 (describing the flavor industry's goal to develop vanilla compound flavors "That *Seem*[s] to be Authentic or at Least Derived from a Natural Source") (emphasis added).

C. <u>Decline of Industry Self-Governance</u>

40.    That high-level executives in the flavor industry are willing to boast of their stratagems to give consumers less vanilla for the same or greater price is not unexpected.

41.    The once powerful and respected trade group, The Flavor and Extract Manufacturers Association ("FEMA"), abandoned its "self-policing" of misleading vanilla labeling claims and disbanding its Vanilla Committee.

42.    FEMA previously opposed industry efforts to deceive consumers but cast the public to the curb in pursuit of membership dues from its largest members, such as Unilever and Danone.

IV. The Product's Representations are Misleading Because They Fail to Disclose the Percent of Real Vanilla and Contain Vanillin

43.    The front label states "Vanilla With Other Natural Flavors," which is the terminology prescribed for where a "food contains both a characterizing flavor from the product whose flavor is simulated and *other natural flavor* which simulates, resembles or reinforces the characterizing flavor." *See* 21 C.F.R. § 101.22(i)(1)(iii) (emphasis added)).

44.    The Product's front label "Vanilla With Other Natural Flavors," represents it contains an amount of the characterizing vanilla flavor sufficient to independently characterize the Product.  *See* 21 C.F.R. § 101.22(i)(1)(iii)

45.    The relevant regulation relied on for the front label states:

> If the food contains both a characterizing flavor from the product whose flavor is simulated and other natural flavor which simulates, resembles or reinforces the characterizing flavor, the food shall be labeled in accordance with the introductory text and paragraph (i)(1)(i) of this section and the name of the food shall be immediately followed by the words "with other natural flavor" in letters not less than one-half the height of the letters used in the name of the characterizing flavor.

21 C.F.R. § 101.22(i)(1)(iii)

46.    The "introductory text" describes a scenario where a food contains "no artificial flavor which simulates, resembles or reinforces the characterizing flavor," and none of the sub-paragraphs of 21 C.F.R. § 101.22(i)(1) apply.

47.    The result is "Vanilla With Other Natural Flavor" because 21 C.F.R. § 101.22(i)(1) references the labeling of a food by the name of its characterizing flavor supplied by its characterizing ingredient, "vanilla."

48.    Sub-paragraph (i) of 21 C.F.R. § 101.22(i)(1) describes a scenario where the amount of a characterizing vanilla flavor is insufficient to independently characterize the food, resulting in a front label of "[Vanilla] Flavored With Other Natural Flavor." *See* 21 C.F.R. § 101.22(i)(1)(iii) referring to "paragraph (i)(1)(i) of this section"; *see also* 21 C.F.R. § 101.22(i)(1)(i).

49.    The ingredient listed on the information panel, "Natural Flavor," is consistent with an ingredient which contains some vanilla and some non-vanilla flavor.

Ingredient List



INGREDIENTS: ALMONDMILK (FILTERED WATER, ALMONDS), COCONUTMILK (FILTERED WATER, COCONUT CREAM), CALCIUM CARBONATE, NATURAL FLAVORS, POTASSIUM CITRATE, SEA SALT, SUNFLOWER LECITHIN, GELLAN GUM, VITAMIN A PALMITATE, VITAMIN D2, D-ALPHA-TOCOPHEROL (NATURAL VITAMIN E).

50.    "Natural Flavor" does not refer to a standardized vanilla ingredient – vanilla extract, vanilla flavoring, vanilla-vanillin extract, etc. – because these would be specifically declared. *See* 21 C.F.R. § 101.4(a)(1) ("Ingredients required to be declared on the label or labeling of a food, including foods that comply with standards of identity, except those ingredients exempted by 101.100, shall be listed by common or usual name.").

51.    However, because the "Natural Flavor" contains vanilla and vanillin, it is false, misleading and unlawful to not disclose these facts on the ingredient list and the front label.

52.    Vanillin has been the most persistent challenger to the authenticity of real vanilla has been synthetic versions of its main flavor component, vanillin.

53.    First synthesized from non-vanilla sources by German chemists in the mid-1800s, vanillin was the equivalent of steroids for vanilla flavor.

54.    According to Skip Rosskam, a professor of vanilla at Penn State University and former head of the David Michael flavor house in Philadelphia, "one ounce of vanillin is equal to

a full gallon of single-fold vanilla extract."[22]

55.   Today, only 1-2% of vanillin in commercial use is vanillin obtained from the vanilla plant, which means that almost all vanillin has no connection to the vanilla bean.

56.   Disclosure of this powerful ingredient has always been required where a product purports to be flavored with vanilla. *See* Kansas State Board of Health, Bulletin, Vol. 7, 1911, p. 168 (cautioning consumers that flavor combinations such as "vanilla and vanillin…vanilla flavor compound," etc., are not "vanilla [extract] no matter what claims, explanations or formulas are given on the label.").

57.   However, vanilla products are subject to their own standard of identity and labeling requirements, which existed long before the general flavor regulations were promulgated.

58.   The "Other Natural Flavors" referenced on the front panel include vanillin, purportedly made through a natural process.

59.   By adding "Other Natural Flavors" to a standardized exclusively vanilla ingredient – vanilla extract or vanilla flavoring – consumers are not receiving the same high quality and expensive ingredient and are unaccustomed to such a pairing.

60.   Consumers are deceived because defendant's reference to "Other Natural Flavors" fails to specify how much of the Product's flavor is from vanilla vis-à-vis non-vanilla vanillin. Exhibit A, Letter from FDA to Ernie Molina, Warner-Jenkinson Company of California, January 17, 1980 ("the general principles of 21 CFR 102.5 should apply" and proportions of each component should be disclosed, i.e., "contains 50% vanilla extract and 50% non-vanilla flavors" or otherwise disclose the proportions.).

61.   This prevents consumers from being misled by products which may taste similar to

---

[22] Katy Severson, Imitation vs. Real Vanilla: Scientists Explain How Baking Affects Flavor, Huffington Post, May 21, 2019.

real vanilla and but for consumer protection requirements, would be sold at the price of real vanilla.

62.    The "fortification" of vanilla with vanillin is one of the oldest and most deceptive ways by which consumers are misled as to their purchase. was one of the reasons standards of identity for vanilla were promulgated.

63.    Prior to the enactment of standards under the Federal Food Drugs & Cosmetic Act ("FFDCA") during the era of the "Pure Food Laws," Notices of Judgment were regularly issued against manufacturers who passed off imitation vanilla products:

> Misbranding was alleged for the further reason that the product was labeled and branded so as to deceive and mislead the purchaser thereof, in that said label was calculated and intended to create the impression and belief in the mind of the purchaser that the product was a genuine vanilla extract, whereas, in fact, it was a mixture of vanilla extract, vanillin, and coumarin, artificially colored with caramel.

> Notice of Judgment No. 2241, Adulteration And Misbranding of…Vanilla Extract, United States Department of Agriculture, W. M. Hays, Acting Secretary, Washington, D.C., January 23, 1913.

64.    Technological developments in the production of vanillin have enabled and emboldened companies to mislead consumers by supplying a trace of vanilla extract, boosted by vanillin made through fermentation, a natural process.

65.    Vanillin produced through a natural process, *viz*, fermentation, may be designated as "'natural flavor' or 'contains natural flavor'" in the context of the general flavor regulations at 21 C.F.R. § 101.22.  Exhibit C, FDA Letter, Ferre-Hockensmith to Richard Brownell, Jr., August 5, 2008, p. 2; Exhibit D, FDA Letter, Ferre-Hockensmith to Betsy D. Carlton, Ph.D., October 8, 2004 (the common or usual name of vanillin derived through a natural fermentation process is "vanillin" though it may be identified as "'vanillin derived naturally through fermentation' elsewhere on your product label.").

66.    To circumvent the safeguards against consumer deception, producers of vanillin have sought to have this "new" vanillin be deemed a "natural flavor" and disregard the long-established

standards of identity for vanilla products.

67.    If naturally produced vanillin were added separately to another finished food, it could be listed in the ingredients as "'vanillin' or 'natural flavor' but it should not be done in a way to imply that it is a 'natural vanilla flavor' because it is not derived from vanilla beans."  Exhibit E, FDA Letter, Negash Belay to Agneta Weisz, October 10, 2008; Exhibit F, FDA Letter, Singh to Anthony Filandro, July 9, 1991 (naturally produced "vanillin would not qualify as 'natural vanillin,' as defined in 21 CFR 101.22(a)(3), because the vanillin is not obtained from vanilla beans, whose flavor it simulates.").

68.    Naturally produced vanillin may be designated "natural flavor" only outside the context of the standardized vanilla ingredients "under sections 169.180, 169.181, and 169.182 in 21 CFR."  Exhibit C, FDA Letter, Ferre-Hockensmith to Richard Brownell, Jr., August 5, 2008, p. 2.

69.    Use of the term "other natural flavors" on the front label is misleading because in the context of vanilla, vanillin has never been a "natural flavor."  Exhibit E, FDA Letter, Negash Belay to Agneta Weisz, October 10, 2008 ("with respect to labeling, the common or usual name of the product you describe is 'vanillin,' regardless of the type of method used to produce it.").

70.    The use of non-vanilla vanillin in the Products is used to boost the trace amount of real vanilla actually present, so consumers believe the taste is from real natural vanilla beans instead of vanillin.

71.    The vanilla regulations provided for vanilla-vanillin combination ingredients but required they have the disclaimer "contains vanillin, an artificial flavor (or flavoring)."  *See* Vanilla-vanillin extract at 21 C.F.R. § 169.180(b) ("The specified name of the food is 'Vanilla-vanillin extract _-fold' or '_-fold vanilla-vanillin extract', followed immediately by the statement

'contains vanillin, an artificial flavor (or flavoring)'."); *see also* 21 C.F.R. § 169.181(b), § 169.182(b) (Vanilla-vanillin flavoring and Vanilla-vanillin powder).

72.    The Product's front label is required to declare the presence of vanillin and identify it as an artificial flavor.

73.    The designation of "natural flavor" fails to disclose the presence of vanillin, which implies the Product's taste is primarily from vanilla beans.

74.    The "natural flavor" on the Product's ingredient list misleads consumers and implies it is a "natural vanilla flavor" with its source as vanilla beans. Exhibit G, FDA Letter, Margaret-Hanna Emerick to Richard Brownell, February 25, 2016 ("natural flavor" must not be used in such a way to imply that it is a "natural vanilla flavor" because it is not derived from vanilla beans").

75.    "Vanilla extract (21 CFR 169.175) and vanilla flavoring (21 CFR 169.177) do not provide for the use of vanillin," which means "vanillin may not be used to make natural vanilla flavors in such standardized foods."  Exhibit B, FDA Letter, Ferre-Hockensmith to Richard Brownell, Jr., April 19, 2005, pp. 1-2; *see* 21 C.F.R. § 169.175(a)(1)-(5) (listing glycerin, propylene glycol, sugar, dextrose and corn sirup as only optional ingredients for vanilla extract).

76.    The standards of identity for vanilla products recognize the unique relationship between vanillin and vanilla, based on the former's use to imitate the latter in a more potent and concentrated amount.

V.    Conclusion

77.    Defendant's representations of the Product are designed to – and does – deceive, mislead, and defraud consumers.

78.    Defendant has sold more of the Products and at higher prices per unit than it would have in the absence of this misconduct, resulting in additional profits at the expense of consumers.

79.     The amount and proportion of the characterizing component, vanilla, has a material bearing on price or consumer acceptance of the Products because consumers are willing to pay more for such Products.

80.     The value of the Product that Plaintiff purchased and consumed was materially less than its value as represented by defendant.

81.     Had plaintiff and class members known the truth, they would not have bought the Products or would have paid less for it.

82.     The Product contains other representations which are misleading and deceptive.

83.     As a result of the false and misleading labeling, the Product is sold at a premium price, approximately no less than $3.59 per cartons of 32 OZ and 64 OZ, excluding tax, compared to other similar products represented in a non-misleading way.

<u>Jurisdiction and Venue</u>

84.     Jurisdiction is proper pursuant to 28 U.S.C. § 1332(d)(2) (Class Action Fairness Act of 2005 or "CAFA").

85.     Under CAFA, district courts have "original federal jurisdiction over class actions involving (1) an aggregate amount in controversy of at least $5,000,000; and (2) minimal diversity[.]" *Gold v. New York Life Ins. Co.*, 730 F.3d 137, 141 (2d Cir. 2013).

86.     Upon information and belief, the aggregate amount in controversy is more than $5,000,000.00, exclusive of interests and costs.

87.     This is a reasonable assumption because defendant's Products are sold in thousands of stores across the country and have been sold bearing the allegedly misleading claims for at least three years.

88.     Plaintiff is a citizen of New York.

89.    Defendant is a California cooperative corporation with a principal place of business in Sacramento, Sacramento County, California and is a citizen of California

90.    This court has personal jurisdiction over defendant because it conducts and transacts business, contracts to provide and/or supply and provides and/or supplies services and/or goods within New York.

91.    Venue is proper because plaintiff and many class members reside in this District and defendant does business in this District and State.

92.    A substantial part of events and omissions giving rise to the claims occurred in this District.

<u>Parties</u>

93.    Plaintiff is a citizen of Far Rockaway, Queens County, New York.

94.    Defendant Blue Diamond Growers is a California cooperative corporation with a principal place of business in Sacramento, California, Sacramento County.

95.    During the relevant statutes of limitations, plaintiff purchased the Product within her district and/or State for personal consumption in reliance on the representations.

<u>Class Allegations</u>

96.    The classes will consist of all purchasers of the Product in New York, the other 49 states and a nationwide class, during the applicable statutes of limitations.

97.    Common questions of law or fact predominate and include whether defendant's representations were and are misleading and if plaintiff and class members are entitled to damages.

98.    Plaintiff's claims and basis for relief are typical to other members because all were subjected to the same unfair and deceptive representations and actions.

99.    Plaintiff is an adequate representatives because her interests do not conflict with

other members.

100.  No individual inquiry is necessary since the focus is only on defendant's practices and the class is definable and ascertainable.

101.  Individual actions would risk inconsistent results, be repetitive and are impractical to justify, as the claims are modest relative to the scope of the harm.

102.  Plaintiff's counsel is competent and experienced in complex class action litigation and intends to adequately and fairly protect class members' interests.

103.  Plaintiff seeks class-wide injunctive relief because the practices continue.

<u>New York GBL §§ 349 & 350</u>
<u>(Consumer Protection from Deceptive Acts)</u>

104.  Plaintiff incorporates by reference all preceding paragraphs.

105.  Plaintiff and class members desired to purchase, consume and use products or services which were as described and marketed by defendant and expected by reasonable consumers, given the product or service type.

106.  Defendant's acts and omissions are not unique to the parties and have a broader impact on the public.

107.  Defendant misrepresented the substantive, quality, compositional, organoleptic and/or nutritional attributes of the Products.

108.  Defendant's conduct was misleading, deceptive, unlawful, fraudulent, and unfair because it fails to disclose the presence of non-vanilla vanillin, which has always been an artificial flavor in the context of vanilla flavors, and gives the impression to consumers the Products taste is mainly from real vanilla instead of vanillin.

109.  Plaintiff  and class members would not have purchased the Products or paid as much if the true facts had been known, suffering damages.

<u>Negligent Misrepresentation</u>

110.  Plaintiff incorporates by reference all preceding paragraphs.

111.  Defendant misrepresented the substantive, quality, compositional, organoleptic and/or nutritional attributes of the Products.

112.  Defendant's conduct was misleading, deceptive, unlawful, fraudulent, and unfair because it fails to disclose the presence of non-vanilla vanillin, which has always been an artificial flavor in the context of vanilla flavors, and gives the impression to consumers the Products taste is mainly from real vanilla instead of vanillin.

113.   Defendant had a duty to disclose and/or provide non-deceptive marketing of the Products and knew or should have known same were false or misleading.

114.  This duty is based on defendant's position as an entity which has held itself out as having special knowledge and experience in the production, service and/or sale of the product or service type.

115.  The representations took advantage of consumers' (1) cognitive shortcuts made at the point-of-sale and (2) trust placed in defendant, a well-known and respected brand in this sector.

116.  Plaintiff and class members reasonably and justifiably relied on these negligent misrepresentations and omissions, which served to induce and did induce, the purchase of the Products.

117.  Plaintiff and class members would not have purchased the Products or paid as much if the true facts had been known, suffering damages.

<u>Breaches of Express Warranty, Implied Warranty of Merchantability and
Magnuson Moss Warranty Act, 15 U.S.C. §§ 2301, *et seq.*</u>

118.  Plaintiff incorporates by reference all preceding paragraphs.

119.  The Products were manufactured, labeled and sold by defendant and warranted to

Plaintiff and class members that they possessed substantive, functional, nutritional, qualitative, compositional, organoleptic, sensory, physical and other attributes which they did not.

120.  Defendant had a duty to disclose and/or provide non-deceptive descriptions and marketing of the Products.

121.  This duty is based, in part, on defendant's position as one of the most recognized companies in the nation in this sector.

122.  Plaintiff provided or will provide notice to defendant, its agents, representatives, retailers and their employees.

123.  Defendant received notice and should have been aware of these misrepresentations due to numerous complaints by consumers to its main office over the past several years.

124.  The Products did not conform to their affirmations of fact and promises due to defendant's actions and were not merchantable.

125.  Plaintiff and class members would not have purchased the Products or paid as much if the true facts had been known, suffering damages.

<u>Fraud</u>

126.  Plaintiff incorporates by reference all preceding paragraphs.

127.  Defendant's conduct was misleading, deceptive, unlawful, fraudulent, and unfair because it fails to disclose the presence of non-vanilla vanillin, which has always been an artificial flavor in the context of vanilla flavors, and gives the impression to consumers the Products taste is mainly from real vanilla instead of vanillin.

128.  Defendant's fraudulent intent is evinced by its failure to accurately identify the Products on the front label when it knew this was not true.

129.  Plaintiff and class members would not have purchased the Products or paid as much

if the true facts had been known, suffering damages.

<u>Unjust Enrichment</u>

130.  Plaintiff incorporates by reference all preceding paragraphs.

131.  Defendant obtained benefits and monies because the Products were not as represented and expected, to the detriment and impoverishment of plaintiff and class members, who seek restitution and disgorgement of inequitably obtained profits.

<u>Jury Demand and Prayer for Relief</u>

Plaintiff demands a jury trial on all issues.

  **WHEREFORE**, Plaintiff prays for judgment:

1.  Declaring this a proper class action, certifying Plaintiff as representative and undersigned as counsel for the class;

2.  Entering preliminary and permanent injunctive relief by directing defendant to correct the challenged practices to comply with the law;

3.  Injunctive relief to remove, correct and/or refrain from the challenged practices and representations, restitution and disgorgement for members of the State Subclasses pursuant to the applicable laws of their States;

4.  Awarding monetary damages and interest pursuant to the common law and other statutory claims;

5.  Awarding costs and expenses, including reasonable fees for plaintiff's attorneys and experts; and

6.  Other and further relief as the Court deems just and proper.

Dated:   March 12, 2020

                              Respectfully submitted,

                              Sheehan & Associates, P.C.
                              /s/Spencer Sheehan

Spencer Sheehan
505 Northern Blvd Ste 311
Great Neck NY 11021-5101
Tel: (516) 303-0552
Fax: (516) 234-7800
*spencer@spencersheehan.com*
E.D.N.Y. # SS-8533
S.D.N.Y. # SS-2056

Reese LLP
Michael R. Reese
100 W 93rd St Fl 16
New York NY 10025-7524
Telephone: (212) 643-0500
Fax: (212) 253-4272
*mreese@reesellp.com*

1:20-cv-01347
United States District Court
Eastern District of New York

Sonya Lamonakis, individually and on behalf of all others similarly situated,

Plaintiff,

- against -

Blue Diamond Growers,

Defendant

## Complaint

Sheehan & Associates, P.C.
505 Northern Blvd Ste 311
Great Neck NY 11021-5101
Tel: (516) 303-0552
Fax: (516) 234-7800

Pursuant to 22 NYCRR 130-1.1, the undersigned, an attorney admitted to practice in the courts of New York State, certifies that, upon information, and belief, formed after an inquiry reasonable under the circumstances, the contentions contained in the annexed documents are not frivolous.

Dated:  March 12, 2020

/s/ Spencer Sheehan
Spencer Sheehan